## UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THORSTEN BUSCH )<br> Plaintiff. )<br>vs. )<br> )<br>AIRBUS S.A.S.; Airbus Americas, Inc.; Airbus )<br>Americas Engineering, Inc.; and UMB Bank, N.A. )<br> )<br> Defendants. ) | C.A. NO.: |

## **COMPLAINT**

Now comes the Plaintiff, THORSTEN BUSCH ("Plaintiff") and alleges as follows:

## **PARTIES**

1. The Plaintiff, Thorsten Busch, is a resident of Mound, Minnesota.

2. Defendant Airbus S.A.S. ("Airbus S.A.S.") is a French corporation with a principal place of business in Toulouse, France. Airbus S.A.S. designs, manufactures, assembles, services, and sells civil commercial aircraft, including the Airbus A320 family aircraft (including the Airbus A319, A320, A321 and variants of each) to customers in the United States and across the world.

3. Defendant Airbus Americas, Inc. ("Airbus Americas") is a Delaware corporation with a principal place of business in Herndon, Virginia. Airbus Americas, Inc. designs, produces, manufactures, and delivers commercial aircraft to customers in the United States. Airbus Americas is a wholly owned direct subsidiary of Airbus S.A.S.

4. Defendant Airbus Americas Engineering, Inc. ("AA Engineering") designed aircraft and/or manufactured components in Mobile, Alabama, and Wichita, Kansas. AA Engineering merged into Airbus Americas on December 31, 2017.

1

5. Defendant UMB Bank, N.A. ("UMB") is a national banking association with a principal place of business in Kansas City, Missouri.

6. Airbus S.A.S., Airbus Americas Airbus and AA Engineering hold themselves out publicly as a single operating entity and often refer to themselves as "Airbus" in their advertising, public website, and/or social media.

## FACTS

7. At all times relevant to the claims herein, Plaintiff was employed as a pilot by JetBlue Airways Corporation ("JetBlue").

8. JetBlue is a Delaware corporation, headquartered in in Long Island City, New York, New York.  It operates passenger service throughout the United States and North America on commercial airliners.

9. Boston and New York are two of JetBlue's "home bases" for its inflight crewmembers, including Plaintiff.

10. In 2019 and 2022, Plaintiff was injured piloting commercial flights for JetBlue.  On August 27, 2019 and April 26, 2022, Plaintiff suffered exposure injuries while piloting the exact same Airliner referred to at different times as Tail Number N527JB and Tail Number N527JL (the "Airliner.")

11. Plaintiff filed pending workers' compensation claims.

12. At the time of the first injury/exposure, Plaintiff was on a flight crew based in Boston.

13. At the time of the second injury/exposure, Plaintiff was on a flight crew based in New York.

## FACTS: THE AIRLINER

14. The Airliner is a model A320-232 aircraft. It is a fixed-wing multi-engine aircraft manufactured in 2001.

15. Upon information and belief, the Airliner was sold to JetBlue and/or its predecessor in interest, New Air Corporation, pursuant to a 1999 purchase agreement ("1999 Purchase Agreement") by AVSA S.A.R.L.[1]

16. Airbus S.A.S., and/or its predecessor in interest, manufactured, assembled and/or sold the Airliner that injured the Plaintiff.

17. Upon information and belief, the Airliner was delivered to JetBlue in and around September of 2001. Upon information and belief, the Airliner was operated by JetBlue until approximately 2006.

18. Upon information and belief, in 2010, the Airliner was placed back in service with JetBlue and has operated as a JetBlue aircraft up to and including the present.

19. Upon information and belief, AA Engineering performed maintenance, repair and/or updates or reconfiguration on the Airliner at all times relevant to this complaint.

20. Upon information and belief, Airbus Americas has performed maintenance, repair and/or updates or reconfiguration on the Airliner at all times relevant to this complaint.

21. At the time of Plaintiff's injuries, UMB was the registered owner (as trustee) of the Airliner.[2]

---

[1] AVSA S.A.R.L. is a predecessor in interest to Airbus S.A.S.

[2] UMB is involved in the transaction as part of its corporate trust business out of its Salt Lake City office specializing in commercial aviation.

## JURISDICTION

22. Jurisdiction and venue is proper in the United States District Court for the Southern District of New York.

23. The 1999 Purchase Agreement and subsequent purchase agreements between Airbus S.A.S. and/or its predecessors in interest, contain a New York choice-of-law clause that specifies that the parties submit to the jurisdiction of New York Courts for any actions or proceedings arising out of the agreement.

24. Pursuant to the purchase Agreements with JetBlue, and/or ownership of the Airliner, Defendants derive substantial revenue from business in New York such that the requirements from general and or specific jurisdiction, together with the requisite minimum contacts are satisfied.

25. Consequently, Defendants purposefully directed and purposefully conducted activities within the State of New York thereby invoking the benefits and protections of New York's laws.

26. Defendants, at all times material hereto, assumed all responsibility for, providing inspection, repair, service, maintenance, replacement, overhaul, warnings, parts, instructions maintenance manuals, continuing airworthiness information, and other information with respect to the Airliner.

27. Defendants, at all times material hereto, were involved in the design, engineering, manufacturing, assembly, testing, marketing, distributing and/or selling of the Airliner.

28. The parties are citizens of different states.

29. The amount in controversy exceeds $75,000.00, exclusive of costs.

30. Venue in this District satisfies the requirements of 28 U.S.C. § 1391, in that the Defendants are subject to personal jurisdiction because they transact business in this District.

31. Defendants have also submitted to personal jurisdiction in this venue in litigating a similar products liability claim – Kristi Vuksanovich et. al. v. Airbus Americas, Inc. et. al. 21-cv-3454-KPF - in which they raised statute of limitations defenses predicated upon New York law.  In litigating thusly, Defendants forwent any challenge to Personal Jurisdiction.

## FACTS: BLEED AIR AND BLEED AIR SYSTEMS

32. Bleed air refers to air on an aircraft that comes into the cabin via its bleed air system.

33. A bleed air system uses a network of ducts, valves and regulators to conduct medium to high pressure air, "bled" from the compressor section of the engine(s) and auxiliary power unit (APU), to various locations within the aircraft. There the air is utilized for a number of functions including pressurization; air conditioning; engine start; wing and engine anti-ice systems; water system pressurization; hydraulic system reservoir pressurization; and/or boundary layer separation enhancement.

34. The use of the air for pressurization and air-conditioning is of particular importance/relevance to the operation of aircraft and this action.

35. After leaving the engine and passing through the air-conditioning pack, where it is cooled, this bleed air is combined with recirculated cabin air before it enters the cabin. The airliner cabin is a hermetically sealed pressure vessel, with an inflow of bleed air and a computer-controlled outflow, which exhausts back to the atmosphere.

36. Bleed air must be cooled because Jet engines operate at extremely high temperatures. However, in the cooling process, the bleed air is not cleaned/filtered or any such filtration is inadequate.

37. After it is cooled, bleed air then vents to the interior of the aircraft.

38. Bleed air is also used to pre- pressurize the hydraulic systems (hydraulic pumps, and some actuators are mounted in the engines.)  The extremely high pressure of aircraft hydraulic systems (>10 MPa) creates "sweats", leaks and/or ruptures. The overall result is that the interior air of an aircraft utilizing such a system can, and do, become contaminated by hydraulic fluid in addition to the engine lubricating oil and other substances that are toxic to humans.

39. If any filters are present, they are not adequate to filter the toxins from engine oil decomposition, known as volatile organic compounds, from being introduced into the interior of the aircraft.

40. The introduction of such toxins into the cabin, where they are then inhaled by both passengers and flight crew, is foreseeable and contemplated by manufacturers and those involved with the manufacture and sale of commercial airliners including the Defendants.

41. All jet engine lubricating oil and/or aircraft hydraulic fluid are harmful to humans with various degrees of toxicity as are other substances that make their way into the cabin due to bleed air systems.

42. Air contamination can, and does, occur during normal operation of an airplane but is particularly high and detectable during "fume events" or events where additional toxins enter the air system.

43. The Airliner which injured the Plaintiff utilizes a bleed air system substantially similar the one described above.

44. Model A320 aircraft manufactured by Airbus S.A.S. and/or maintained, repaired or modified by Airbus Americas and/or AA Engineering have a long-documented history of fume events and incidents wherein flight crews and/or passengers become ill.

45. Defendants have long had awareness of "fume events" and/or issues with aircraft cabin air quality related to bleed air systems.

46. Defendants have taken no steps, and/or inadequate/unreasonable steps, to provide monitoring for toxic bleed air in their aircraft and it has failed to direct its customers to do the same.

47. Defendants have refused and/or failed to act despite substantial research and data as well as publicized fume events. Bleed air systems and/or cabin air quality on commercial aircraft have been the subject of numerous studies by private researchers and/or investigations by various agencies and/or state actors across multiple countries for at least the past 30 years.

48. In 1994, the U.S. Congress mandated that the Federal Aviation Administration ("FAA") establish an aircraft cabin air quality research program and to collaborate with the Centers for Disease Control and Prevention (CDC) to carry out studies specific to cabin air quality (Public Law 103-305, 1994).

49. In 1999, the FAA reviewed its event database between January 1978 and December 1999 involving "air quality." Of the 240 events identified in the search, about 60 were "airplane ventilation toxic contaminant events." Of the 60 or so events, 24 times

crewmembers reported their performance was impacted. Upon information and belief, this is only a small fraction of such events.

50. The FAA Modernization and Reform Act of 2012 required the Federal Aviation Administration ("FAA") to establish a research program focused on aircraft engine/APU bleed air.

51. In November of 2015, the FAA's Aerospace Medicine Technical Report No.DOT/FAA/AM- 15/20 was published. It noted that "[t]he quality of air distributed throughout the cockpit and cabin during air transportation in a pressurized aircraft is critically important to human health. For more than 30 years, the topic of cabin air quality has been of concern."

52. In June 2017, Dr. Susan Michaelis, a former pilot and renowned expert in the field of aviation safety published research on contaminated air. The article titled "Aerotoxic Syndrome: A New Occupational Disease?" concluded that there was a cause and effect relationship existed between identified aircrew symptoms, diagnoses, etc. and contaminated air in the occupational environment.

53. Aerotoxic Syndrome and fume events has been a frequent topic in the national news.

54. On August 11, 2017, a JetBlue flight was forced to make an emergency landing in Buffalo, New York after fumes caused passengers and crew to become ill. Three crew members were hospitalized.[3] [4]

---

[3] https://www.newyorkupstate.com/buffalo/2017/08/flight_makes_emergency_landing_in_buffalo_after_crew_members_become_ill.html

[4] https://www.youtube.com/watch?v=sKTn9sWOFb8

55. On December 24, 2018, a JetBlue aircraft was forced to make an emergency landing in New York City because of a fume event.[5]

56. Aerotoxic Syndrome and fume events are so pervasive that the U.S. Congress has written to JetBlue.  By letter dated September 19, 2019, House of Representatives member John Garamendi and Senator Richard Blumenthal sought information from JetBlue about multiple fume events on planes manufactured by the Defendants.[6]

57. Subsequently, during its 117th session, the U.S. House of Representatives of Congress considered a bill establishing safety standards for air supply on aircraft (H.R. 7267 March 29, 2022). It seeks to mandate cabin air monitoring, required training for crew, and established reporting requirement for smoke and/or fume events.

58. Reasonable alternative designs exist. The Boeing 787 Dreamliner does not use bleed air systems and instead utilizes electrical compressors.

59. Such so-called "no-bleed" systems are more fuel efficient and environmentally sound. Such systems reduce maintenance times and costs by replacing complex bleed-air systems with a simpler, more reliable compressor-based system.  Such systems reduce aircraft weight while improving aircraft reliability and performance.

60. Various aircraft manufacturers acknowledge that no-bleed systems improve air quality and eliminate "engine contaminants potentially entering cabin air-supply."

---

[5] https://pix11.com/news/jetblue-plane-makes-emergency-landing-in-nyc-on-christmas-eve-due-to-unusual-odor-officials/

[6] https://45ijagbx6du4albwj3e23cj1-wpengine.netdna-ssl.com/wp-content/uploads/2019_09_19-Letter-to-JetBlue-re-Cabin-Air-Safety-Events_FINAL1.pdf

9

61. Since at least 2004, alternative no-bleed systems have been available for the Defendants. No bleed systems have been in service for commercial aviation carriers since at least 2011.

62. Upon information and belief, the Defendants have performed some level of real-time monitoring of cabin air quality on their aircraft since 2012.[7]

63. Defendants have deliberately refused to acknowledge, adequately track and/or otherwise ignored air-quality issues involving bleed air systems. They have similarly refused to modify planes currently in operation – including the Airliner which injured the Plaintiff – to make them safe and to guard against these known hazards, deficiencies, and/or defective components/designs, of bleed air systems.

64. In addition, Defendants could refit planes in operation – including the Airliner which injured the Plaintiff – to lessen or eliminate the risk of air quality issues caused by bleed air systems without placing an undue burden upon themselves. Refit and/or retrofit would also have the added benefit of ensuring the safety of end users such as the Plaintiff.

## FACTS: "FUME EVENTS"

65. A "fume event" is when noxious gas, smoke, or vapor accumulates in and/or travels into the cabin of an aircraft including the cockpit.

---

[7] Commercial aircraft manufacturers have performed their own studies related to fume events and/or cabin air quality back to the 1950s. Such studies concluded that adequate and substantial filtration was necessary to purify and/or make-safe engine bleed air.

10

66. Consequently, the term "fume event" has been used to refer to a potentially toxic environment created by contaminated air.

67. Fume events on aircraft can sometimes produce distinctive odors, often described as a chemical, oily, or a "dirty socks" smell.

68. Upon information and belief, commercial airlines – including JetBlue – track "fume events" reported by crew and customers.

69. For some time, the Defendants have been aware of fume events and underlying air quality issues and the resultant health impacts upon crew and customers of commercial airline operators.

70. During fume events, airborne vapors and toxicants contaminate cockpit and cabin air.

71. Toxicants include a complex mixture of oil-based compounds, irritant gases, and ultra-fine particles are present in the cabin and cock-pit.

72. Such toxicants include carbon monoxide ("CO") from engine exhaust and carbon dioxide ("CO2") as a product of incomplete combustion. Exposure to high CO2 concentrations can lead to symptoms such as headache, dizziness, and restlessness and ultimately lead to asphyxia.

73. Vapors contained in contaminated cockpit/cabin air may also include both volatile ("VOCs") and semi-volatile organic compounds ("SVOCs"), both of which are chemical compounds based on carbon chains or rings that also contain hydrogen with or without oxygen, nitrogen, and other elements that represent constituents of jet engine oils, hydraulic fluids, and deicing fluids.

74. Among the many possible VOCs and SVOCs representing constituents of contaminated bleed air, particular concern has been attributed to tricresyl phosphates ("TCPs"), N-

phenyl-Lnaphthylamine (PAN), and carbon monoxide. TCPs are anti-wearing agents that are added to all jet engine oils used on jet propelled commercial airliners in the United States.

75. Tricresyl phosphates are known neurotoxins, i.e. nerve agents. A neurotoxin or nerve agent is a toxin that acts specifically on the nervous system.

76. Tricresyl phosphates are organophosphates. Organophosphates are chemical compounds used in insecticides, herbicides, pesticides, nerve agents and nerve gases, all sharing a similar chemical structure. Organophosphates, as a family of chemicals, are considered toxic to human health. Indeed, in 2001, the Environmental Protection Agency banned most residential uses of organophosphates in part because of their risk to human health.

77. Fume events and even routine cockpit/cabin air can – because of bleed air systems – result in crew and customers inhaling toxic air that causes them to experience both short-term transient symptoms as well as, for individuals like the Plaintiff, permanent and serious personal injury.

78. For many years prior to the events giving rise to this action, the Defendants have inadequately warned their customers and various regulatory authorities of the number of reported incidents and issues with fume events occurring on aircraft they manufacture, aircraft utilizing bleed-air systems and/or aircraft substantially similar to the Airliner upon which Plaintiff suffered injury.

79. The Defendants have not reasonably and/or adequately warned, tested and/or advised that the filters used on board do not protect against the volatile organic compounds stemming from engine oil decomposition and/or the utility of using personal protective gear to prevent exposure.

80. The Defendants' failures and continuing failures to adequately warn and advise the purchasers – i.e. JetBlue – and users – i.e. the Plaintiff – of their planes such that purchasers and users may take preventive measures or insist on retro-fitted systems and/or air monitoring alternatives prevented the Plaintiff from intelligently and/or adequately protecting himself from dangers and/or air quality issues that have at all relevant times been known to the Defendants.

### FACTS: PLAINTIFF'S INJURIES

81. On or about August 27, 2019, Plaintiff was piloting the Airliner from San Juan, Puerto Rico to Ft. Lauderdale, Florida.

82. Upon landing, Plaintiff turned on the air conditioner on the Airliner and immediately perceived a "dirty sock" smell.

83. Turning on the APU was necessary to operate the air conditioning. Doing thusly circulated air directly from the bleed air system of the Airliner throughout its cabin.

84. This fume event was reported to JetBlue contemporaneously.

85. Within 20-30 minutes, Plaintiff began having difficulty speaking coherently and reported that he felt intoxicated, dizzy and confused.

86. Plaintiff was thereafter taken via ambulance to a local hospital.

87. Plaintiff's symptoms persisted after his exposure on August 27, 2019.

88. On September 5, 2019, Plaintiff was examined by Dr. Zeke McKinney ("Dr. McKinney") at the HealthPartners Riverway Anoka Occupational and Environmental Medicine clinic.

89. Dr. McKinney diagnosed the Plaintiff with an acute brain injury secondary to irritant volatile organic compound exposure, related to contaminated air in the interior of the

aircraft due to leaking engine oil products in the interior aircraft being bled from the compression of the jet engines.

90. Dr. McKinney directly causally related Plaintiff's symptoms to contaminated bleed air on the Airliner.

91. Plaintiff subsequently experienced a range of systems including cognitive and memory abnormalities, dizziness, visual dysfunction, balance/coordination abnormalities, fatigue, headache, anxiety, as well as exacerbation of his symptoms with physical and cognitive activity.

92. The FAA requires medical certification/standards for pilots. Due to Plaintiff's physical and neurological symptoms his medical certification was revoked in November 2020 due to Plaintiff's "history of Acute Brain Injury from work related to Occupational Chemical Exposure."

93. After many months of occupational, ocular and physical therapy and other treatment, Plaintiff sought medical certification from the FAA to return to flying in September 2021.

94. Plaintiff was cleared by the FAA to fly for JetBlue in December 2021.

95. Plaintiff's perfect, or near perfect, vision did not return after his August 2019 injury and he continues to have ocular issues to date.

96. Subsequently, on or about April 26, 2022, Plaintiff was a passenger on the Airliner traveling from JFK Airport in New York to an island in the Caribbean. Plaintiff was "deadheading" and was not the operator of the Airliner but was flying in order to go to the destination to pick up another aircraft.

97. After arriving at the destination, Plaintiff woke up the next morning and began experiencing vision issues.

98. Plaintiff's vision seemed to improve and Plaintiff was capable of operating his scheduled flight to Puerto Vallarta, Mexico.

99. During the flight to Puerto Vallarta, Mexico Plaintiff began experiencing renewed vision symptoms as well as tremors, headache and dizziness.

100. Upon landing at Puerto Vallarta, the symptoms got progressively worse and the Plaintiff immediately sought medical treatment arranged by the Chief Pilot's Office.

101. Subsequently, Plaintiff has not returned to work and has experienced renewed symptoms including vision difficulties and various other neurological and physical impairments and injury which prevent him from working as a pilot.

102. Dr. McKinney has again causally related these injuries and/or symptoms to exposure on the Airliner.

103. Plaintiff has lost and continues to lose wages and earning capacity as well as experiencing a wide range of physical and neurological symptoms.

## COUNT I – NEGLIGENCE

104. The Plaintiff repeats and incorporates herein the preceding paragraphs as if each set forth here in its entirety.

105. The Defendants designed, manufactured, inspected, tested, marketed, owned, leased distributed, repaired, retrofitted and/or sold the Airliner.

106. The Defendants had a duty to exercise reasonable care in the design, manufacture, inspection, testing, marketing, repair, retrofit or sale of the Airliner so as to guard against foreseeable and avoidable risks of harm attendant with its use.

107. The Defendants breached their duty to exercise reasonable care in the design, manufacture, inspection, testing, marketing, distribution, repair, retrofit or sale of the

Airliner so as to guard against foreseeable and avoidable risks of harm attendant with its use.

108. It was feasible to design the product in a safer manner and/or retrofit those aspects of the original design that were unreasonably dangerous.

109. The Defendants breached their duty to exercise reasonable care when they placed in the channels of trade or commerce a product which they knew or reasonably should have known was dangerous, defective and/or not reasonably safe for its intended use and purpose.

110. The Defendants were negligent in failing to adequately warn and/or instruct the users of the Airliner about the potential hazards associated with the use of the Airliner

111. The Defendants failed to warn about the dangers, frequency and scope of harm that a cabin air fume event could cause upon exposure/inhalation and further how one could protect oneself or how the user of the Airliner could minimize the risk.

112. The Defendants failed to provide proper instructions and guidelines, studies or data in its aircraft operation manuals and literature accompanying the sale of the Airliner.

113. The Defendants failed to update warnings and instructions post sale and notify known users of the Airliner as more information became available about the dangers of cabin air fume exposure.

114. The Defendants failed to develop mitigation strategies which airline operators – i.e. JetBlue - could consider to employ for the benefit of its pilots and air transportation workers such as the Plaintiff.

115. The Defendants failed to conduct adequate testing and post marketing sales surveillance capturing data and incidence rates which reasonably would have led to earlier warnings

and guidance on available steps that both airlines and operators of its aircraft might employ to mitigate or avoid the risk of air cabin fume exposure events.

116. Based upon information and belief the Defendants failed to notify the applicable aviation authorities as well as aircraft owners of the information that they were aware of and which they had collected in regards to the incidence rates and severity of the air cabin fume exposure events.

117. As a direct and proximate result of the Defendants' breaches, the Plaintiff was caused to suffer and continues to be caused to suffer severe and permanent personal injury, physical, mental pain and suffering, past, present and future medical expenses, lost earnings and lost earning capacity, the need for aid and assistance and an impairment to his ability to enjoy life and attend to his usual activities.

118. At all material times, the Plaintiff was in the exercise of due care and free from all comparative negligence.

WHEREFORE, the Plaintiff demands judgment against the Defendants for the aforementioned injuries and damages, together with costs, interest and reasonable attorney's fees.

## COUNT II – BREACH OF EXPRESS AND IMPLIED WARRANTIES

119. The Plaintiff repeats and incorporates herein the preceding paragraphs as if each set forth here in its entirety.

120. The Defendants designed, manufactured, inspected, tested, marketed, owned, leased distributed, repaired, retrofitted and/or sold the Airliner.

121. The Defendants expressly and implicitly warranted to their customers and foreseeable users that the Airliner was safe, merchantable and fit for the uses for which it was intended.

122. The Plaintiff relied upon such warranties.

123. The Airliner was defective and/or not reasonably safe for its intended purpose.

124. The Defendants breached their warranties when they designed, manufactured, inspected, tested, marketed, owned, leased distributed, repaired, retrofitted and/or sold the Airliner.

125. As a direct and proximate result of the Defendants' breaches, the Plaintiff was caused to suffer and continues to be caused to suffer severe and permanent personal injury, physical, mental pain and suffering, past, present and future medical expenses, lost earnings and lost earning capacity, the need for aid and assistance and an impairment to his ability to enjoy life and attend to his usual activities.

WHEREFORE, the Plaintiff demands judgment against the Defendants for the aforementioned injuries and damages, together with costs, interest and reasonable attorney's fees.

## **COUNT III – STRICT PRODUCTS LIABILITY**

126. The Plaintiff repeats and incorporates herein the preceding paragraphs as if each set forth here in its entirety.

127. The Defendants designed, manufactured, inspected, tested, marketed, owned, leased distributed, repaired, retrofitted and/or sold the Airliner.

128. The Airliner was defective and/or unreasonably dangerous in its design, testing and/or manufacture and posed a substantial likelihood of harm.

129. Such dangers/defects were beyond the extent contemplated by ordinary and/or expected users and/or customers.

130. Such dangers/defects were such that the foreseeable and known risks to users and/or customers exceeded the benefits associated with the design and/or formulation.

131. It was feasible to design the product in a safer manner and/or retrofit those aspects of the original design that were unreasonably dangerous.

132. Plaintiff was an expected and/or intended user of the Airliner.

133. Defendants knew or should have known in the exercise of reasonable care of the dangers posed by the Airliner.

134. Defendants failed to provide adequate and/or reasonable notice to expected or intended users of the Airliner of the dangers/defects of the Airliner.

135. The defective design and related failures were a substantial factor in causing the Plaintiff's injury.

WHEREFORE, the Plaintiff demands judgment against the Defendants for the aforementioned injuries and damages, together with costs, interest and reasonable attorney's fees.

## COUNT - IV PUNITIVE DAMAGES

136. The Plaintiff repeats and incorporates herein the preceding paragraphs as if each set forth here in its entirety.

137. The Defendants were long aware of the avoidable dangers posed by their product and ignored and/or actively concealed such dangers and injuries suffered by numerous end users including passengers and crew.

138. The Defendants' conduct as set forth herein was willful, wanton and outrageous and exhibits an utter disregard to Defendants' civil obligations, best practices and societal norms.

139. The Airliner was defective and/or unreasonably dangerous in its design, testing and/or manufacture and posed a substantial likelihood of harm. Said condition was known to the Defendants at the time of manufacture and sale.

140. Defendants' acts and/or omissions were a substantial factor in causing the Plaintiff's injury.

WHEREFORE, the Plaintiff demands judgment against the Defendants for the aforementioned injuries and damages, together with costs, interest and reasonable attorney's fees as well as punitive damages.

PLAINTIFF
By His Attorneys

/s/Stephen M. Reck
Stephen M. Reck
Bar # SR2557
Levin, Rojas, Camassar, and Reck, LLC
P.O. Box 431
North Stonington, CT 06539
attorneyreck@yahoo.com
(860) 535-4040
(860) 535-3434 fax
